# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| LAVILARD ANTOINE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 1:14-cv-00263-NT |
| | ) | |
| CAROL PAUL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTIONS TO DISMISS

The Plaintiffs, eighteen migrant workers who traveled to Maine in 2008 to work in the wild blueberry harvest, assert claims against, among others, Defendant Coastal Blueberry Service, Inc. ("**Coastal**"), Defendant Hancock Foods, Inc. ("**Hancock**"), and Defendant Carol Paul, an individual who allegedly worked on both Coastal and Hancock's behalf (ECF No. 25). The Plaintiffs claim, variously, that the Defendants underpaid them in violation of the Maine Wages and Medium of Payment Act (the "**MWMPA**") and that the Defendants put them up in substandard housing in violation of the Migrant and Seasonal Agricultural Worker Protection Act (the "**AWPA**"). Before the Court are Hancock and Paul's motion seeking dismissal of one category of the Plaintiffs' claims (ECF Nos. 34 & 80), Hancock's motion seeking dismissal of a second category of the Plaintiffs' claims (ECF No. 34), and Coastal's motion seeking dismissal of a third category of the Plaintiffs' claims (ECF No. 35). For the reasons stated below, the Court **DENIES** all three motions.

# LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." The trial court may not grant a Rule 12(b)(6) motion unless the complaint fails the limited notice pleading standard imposed by Federal Rule of Civil Procedure 8(a)(2), which "requires only a plausible short and plain statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (internal citations and quotation marks omitted). The "complaint need not pin plaintiff's claim for relief to a precise legal theory." *Id.*

The court must accept all the well-plead allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, *González Figueroa v. J.C. Penney P.R., Inc.*, 568 F.3d 313, 316 (1st Cir. 2009), but need not accept " '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . .' " *Morales-Cruz v. Univ. of P.R.*, 670 F.3d 220, 225 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, a complaint must contain only "enough factual material 'to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).' " *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

# BACKGROUND[1]

Defendant Coastal, a Maine corporation based in the town of Union, grows and harvests blueberries. First Am. Compl. ¶ 30. Defendant Hancock, a Maine corporation based in the town of Hancock, operates a blueberry processing facility. First Am. Compl. ¶ 32. Both companies employ migrant agricultural workers. First Am. Compl. ¶¶ 30, 32. During the 2008 blueberry season, Defendant Carol Paul, a resident of Lamoine, Maine, recruited, transported, and housed migrant workers on Hancock and Coastal's behalf. First Am. Compl. ¶¶ 29, 33-34. The eighteen Plaintiffs, Creole-speaking migrant workers of Haitian descent hailing predominantly from the American South, are former Hancock and Coastal employees. First Am. Compl. ¶¶ 5-22, 27.

The Plaintiffs bring 360 separately delineated counts against nine separate defendants. The motions before the Court concern claims in only fifteen of those counts, which can be further broken down into three discrete categories: (1) claims involving the alleged use of vehicles to house workers, which Hancock and Paul move to dismiss; (2) a claim that a blueberry processing worker was undercompensated because he was not paid for time spent putting on and taking off protective clothing he needed to work in a freezer, which Hancock moves to dismiss; and (3) claims that blueberry harvesters paid on a "per box" piece rate basis were undercompensated because they were required to overfill boxes, which Coastal moves to dismiss. Because

---

[1] This order's recitations of the factual background are gleaned from the allegations in the First Amended Complaint and presented in the light most favorable to the Plaintiffs. They should not be confused for findings of fact.

each category of claims implicates different sets of factual allegations and legal arguments, the Court discusses them separately below.

## DISCUSSION

### The Vehicles-as-Housing Claims
### Counts 17, 39, 59 & 119

## I.  Factual Allegations

The claims at issue here concern AWPA housing violations that allegedly occurred after Solange Estinvil, Dieuseul Francillon, Lenord Damisse, and Henriquez Polycarpe arrived in Maine. First Am. Compl. ¶¶ 136-38, 343-46, 497-500, 964-67. The claims fit into two groups. The first consists of Estinvil and Francillon's claims concerning their stays at 759 Tunk Lake Road in Sullivan, Maine, found in Counts 39 and 59, respectively. First Am. Compl. ¶¶ 378-86, 532-40. The second consists of Damisse and Polycarpe's claims concerning their first night in Maine, found in Counts 17 and 119, respectively. First Am. Compl. ¶¶ 193-205, 990-1002.[2]

### A.  Estinvil and Francillon's Claims

With respect to Estinvil and Francillon, the First Amended Complaint alleges that Paul and Hancock housed each of them at 759 Tunk Lake Road in Sullivan, Maine, a property owned by another defendant in the case, the George C. Allen Property Trust. First Am. Compl. ¶¶ 378-79, 532-33. 995. Both Estinvil and

---

[2]      Count 17 originally included an additional claim concerning Damisse's housing at 759 Tunk Lake Road during the two or three months following his arrival. First Am. Compl. ¶¶ 205-06. The Plaintiffs voluntarily dismissed that claim, and it is no longer a part of this suit. Pls.' Am. Voluntary Dismissal (ECF No. 30). Count 119 includes an additional claim concerning Polycarpe's housing at 759 Tunk Lake Road during the six weeks following his arrival in Maine. First Am. Compl. ¶¶ 1002-03. That additional claim is not at issue at this time.

Francillon arrived at 759 Tunk Lake Road in late July or early August of 2008. First Am. Compl. ¶¶ 355, 509. Estinvil remained on Tunk Lake Road for only three nights, before being moved to another location. First Am. Compl. ¶ 378. Francillon remained on Tunk Lake Road for approximately six weeks. First Am. Compl. ¶ 532.

There were two residential trailers on the 759 Tunk Lake Road property, one brown and one white. First Am. Compl. ¶¶ 381, 457, 600, 788, 991. Twenty-five to thirty migrant workers employed by Hancock lived in the brown trailer. First Am. Compl. ¶¶ 333, 381, 408, 457. About eighteen migrant workers employed by Hancock lived in the white trailer. First Am. Compl. ¶¶ 574, 600.

The First Amended Complaint alleges that the brown trailer was badly overcrowded. First Am. Compl. ¶ 461. Hancock provided no mattresses or beds for the workers staying there. First Am. Compl. ¶ 461. Plaintiff Jean Etienne slept on a scrap of carpet with a sheet on the floor of the trailer's living area. First Am. Compl. ¶ 461. Plaintiff Clotaire Laguerre slept on a sheet on the floor in a room so overcrowded he could not stretch out. First Am. Compl. ¶ 792. Other workers slept on the floor of the kitchen. First Am. Compl. ¶ 461.[3] According to the complaint, conditions in the white trailer were largely the same. First Am. Compl. ¶ 604. Plaintiff Andrena Jean-Jacques slept in a small bedroom with as many as six other

---

[3] The First Amended Complaint further alleges that the brown trailer's residents were provided only one stove and one refrigerator and were not provided personal storage space, toilet paper, a first aid kit, sufficient hot water for showering, or separate male and female bathroom facilities. First Am. Compl. ¶¶ 461, 996.

workers sharing the floor and a bunk bed. First Am. Compl. ¶ 604. Others slept in the living room, kitchen, and hallway. First Am. Compl. ¶ 604.

For the duration of Estinvil and Francillon's stays at 759 Tunk Lake Road, both trailers were so overcrowded that Estinvil and Francillon were unable to live inside. First Am. Compl. ¶¶ 381, 535. Estinvil slept in a vehicle parked on the property with three other workers. First Am. Compl. ¶ 381. Francillon lived in his own vehicle, also parked on the property, with one other worker. First Am. Compl. ¶ 535.

Estinvil and Francillon allege that Hancock and Paul violated 29 U.S.C. § 1823(a), a subsection of the AWPA's housing provision, during the portion of time they lived in their vehicles on the premises of 759 Tunk Lake Road. First Am. Compl. ¶¶ 384-86, 538-40.

### B.    Damisse and Polycarpe's Claims

With respect to Damisse and Polycarpe, the allegations are more spare. The First Amended Complaint claims that Paul recruited them to work for Hancock (in part by telling Damisse there would be housing in Maine), that Paul transported Damisse and Polycarpe from New Jersey to Maine, and that, on Hancock's behalf, Paul "housed" each of them "in a vehicle for one night upon [their] arrival in Maine." First Am. Compl. ¶¶ 136, 193, 964, 966, 990. The complaint alleges that Paul "located, provided, and controlled" the vehicles, First Am. Compl. ¶¶ 124, 956, and that Paul had the authority to control them insofar as they were provided as housing. First Am. Compl. ¶¶ 195, 992.

Damisse and Polycarpe also claim that Hancock and Paul violated 29 U.S.C. § 1823(a). First Am. Compl. ¶¶ 201-06, 384-86, 538-40, 998-1003.

## II.  Analysis

Hancock and Paul seek dismissal of Estinvil, Francillon, Damisse, and Polycarpe's claims on the basis that the Plaintiffs failed to adequately allege that Hancock and Paul owned or controlled the facilities or real property used to house them during the periods in question, a necessary element of a 29 U.S.C. § 1823(a) claim.

### A.  Statutory and Regulatory Background

Under the AWPA's private right of action, a court that finds a defendant "intentionally violated" any AWPA provision may award "actual damages," "statutory damages of up to $500 per plaintiff per violation, or "other equitable relief . . . ." 29 U.S.C. § 1854(c)(1).

Though the AWPA does not require farm labor contractors or agricultural employers to provide housing to migrant agricultural workers, it imposes minimum standards on employers who choose to do so. *See Rodriguez v. Carlson*, 943 F. Supp. 1263, 1270 (E.D. Wash. 1996). Among these standards are those provided by 29 U.S.C. § 1823(a), which states as follows:

> Except as provided in subsection (c) of this section,[4] each person who *owns or controls* a facility or real property which is used as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State safety and health standards applicable to that housing.

---

[4]  Subsection (c) contains an exception for innkeepers. *See* 29 U.S.C. § 1823(c).

29 U.S.C. 1823(a) (emphasis added).

Interpretive regulations promulgated by the Department of Labor provide that "an 'owner' of a housing facility or real property" is a person who "has a legal or equitable interest" in it, 29 C.F.R. § 500.130(b), and that a person "is in 'control' of a housing facility or real property" if that individual or entity "is in charge of or has the power or authority to oversee, manage, superintend or administer" it, "either personally or through an authorized agent or employee . . . ." 29 C.F.R. § 500.130(c). These regulations specify that, depending on the situation, the "applicable" federal housing standards are either found in Occupational Safety and Health Administration ("**OSHA**") rules governing temporary labor camps or certain Employment Training Administration ("**ETA**") rules. 29 C.F.R. § 500.132; *see also* 29 C.F.R. § 1910.142 (the applicable OSHA rules); 29 C.F.R. §§ 654.404-417 (the applicable ETA rules). The OSHA rules and the ETA rules each set mandatory square-foot-per-occupant levels, require the provision of bedding, establish minimum standards for kitchen and bath areas, and impose various other requirements. *See* 29 C.F.R. §§ 654.404-417, 1910.142.

Because the Department of Labor is charged with administering the AWPA, *see* 29 U.S.C. §§ 1861-62, and because Congress did not directly address what "own" and "control" mean or which federal housing standards are "applicable," the Department of Labor's interpretive regulations are entitled to deference under the *Chevron* doctrine as long as they are based on a permissible construction of the AWPA. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844-45

(1984); *Ramirez v. DeCoster*, 194 F.R.D. 348, 356 (D. Me. 2000) (concluding that *Chevron* governs the validity of regulations interpreting the AWPA promulgated by the Department of Labor).

### B.   Application of the Law to the Plaintiffs' Allegations

#### 1.   Estinvil and Francillon's Claims

With respect to the claims brought by Estinvil and Francillon concerning the time they spent living in vehicles parked on the premises of 759 Tunk Lake Road, the Defendants argue that Estinvil and Francillon failed to plausibly allege that Coastal and Paul "controlled" the vehicles in which Estinvil and Francillon slept. At least with respect to Francillon, who allegedly slept in his *own* car, Coastal and Paul's contention may be right. But it is also beside the point.

Section 1823(a) of the AWPA is written in the disjunctive: a person may be held liable for violating the applicable federal housing standards if the person controls a "facility *or* real property" used to house migrant agricultural workers. 29 U.S.C. § 1823(a) (emphasis added). The First Amended Complaint alleges sufficient facts for the Court to conclude that Hancock and Paul "controlled" the real property at 759 Tunk Lake Road, where Paul arranged for Francillon and Estinvil to live and where they in fact remained, and that the housing provided there fell below the standards set by both the OSHA rules and the ETA rules. No more is required to make out a § 1823(a) claim. *See Rodriguez*, 943 F. Supp. at 1267-70 (holding defendant liable for § 1823(a) violation where plaintiffs resided inside vehicles on real property defendant allowed them to use as housing); *Avila v. A. Sam & Sons*, 856 F. Supp. 763, 768, 770-71 (W.D.N.Y. 1994) (holding defendant liable for § 1823(a)

violation where plaintiffs resided inside a van on real property defendant allowed them to use as housing).

The present case is distinguishable from *Conlan v. U.S. Department of Labor*, 76 F.3d 271 (9th Cir. 1996), a case cited by Hancock and Paul. There, the Ninth Circuit held that the owner of a 1500-acre ranch could not be held liable for housing violations under § 1823(a) where there was no evidence that the defendant had authorized workers to sleep on his property or even knew that they had done so. *Id.* at 275. Here, the Court is not faced with facts suggesting that the Plaintiffs snuck on to the Defendants' property or stayed there unbidden. The Plaintiffs allege that Paul, acting at Hancock's behest, actively arranged for Francillon and Estinvil to stay at 759 Tunk Lake Road and repeatedly visited the property during the period they remained there. First Am. Compl. ¶¶ 334, 379, 409, 533, 552, 742, 955, 1038.

For the reasons stated above, Hancock and Paul's motion fails as to Counts 39 and 59.

### 2.    Damisse and Polycarpe's Claims

With respect to the claims brought by Damisse and Polycarpe, the Defendants argue that the Plaintiffs have failed to adequately allege that Hancock and Paul owned or controlled the vehicles Damisse and Polycarpe slept in during their first evening in Maine because the complaint is impermissibly conclusory.

Damisse and Polycarpe's claims *are* succinct. They each boil down to little more than an allegation that Hancock and Paul "housed" each of them "in a vehicle for one night" upon their arrival in Maine. First Am. Compl. ¶¶ 193, 990. However, giving the verb "housed" its everyday meaning, the Court understands the Plaintiffs to

10

allege that Hancock and Paul provided Damisse and Polycarpe access to the vehicles in question with the intention that they would sleep in them overnight. *See* Webster's Third New Int'l Dictionary 1096 (defining the verb "house" to mean "to lodge or shelter temporarily"). From the fact that Hancock and Paul had access to the vehicles and were able to make them available in this fashion, the Court can infer that Hancock and Paul "controlled" them—that they were in charge of the vehicles and had the authority to oversee them. Reaching the opposite conclusion—that Hancock and Paul were not in charge of the vehicles yet nonetheless made them available to Damisse and Polycarpe for the evening—would require drawing inferences *against* the Plaintiffs. From the fact that vehicles generally lack much of what the OSHA and ETA rules require, the Court can infer that the housing Hancock and Paul provided fell short of applicable federal health and safety standards. Those facts make out an § 1823(a) claim, so Damisse and Polycarpe's allegations are sufficient to show an entitlement to relief. Hancock and Paul's motion therefore fails as to Counts 17 and 119.[5]

---

[5]     Hancock and Paul also argue for dismissal on the basis that no housing standards are applicable if a person houses a migrant agricultural worker in a passenger vehicle, because passenger vehicles are not meant to house people. Def. Hancock's Reply to Pls.' Opp'n 5 & n.3 (ECF No. 55). But under the AWPA, a person who provides any form of housing facility to a migrant agricultural worker must meet the standards set by the OSHA or ETA rules. 29 U.S.C. § 1823(a); 29 C.F.R. § 500.132. The fact that it is difficult to bring a passenger vehicle up to code suggests that a person who chooses to house a migrant agricultural worker in a passenger vehicle has likely violated the AWPA, not that Congress intended a passenger vehicle loophole.

# The Donning and Doffing Claim
# Count 15

## I.  Factual Allegations

Between late July or early August of 2008 and April of 2009, Lenord Damisse spent 134 days working in the freezer of Hancock's blueberry processing facility. First Am. Compl. ¶¶ 160, 170-71, 173. Though this work required Damisse to wear protective clothes, supervisory personnel instructed him to punch in *after* putting the clothes on and to punch out *before* taking the clothes off. First Am. Compl. ¶ 172. As a result, Damisse was never compensated for any of his "donning and doffing" time. First Am. Compl. ¶ 175.

Damisse alleges that this time was "compensable under Maine and federal law," and that by failing to account for it, Hancock underpaid him by $159.61. First Am. Compl. ¶¶ 174-76. Damisse seeks the full amount he claims he was underpaid, trebled, under § 626 of the MWMPA. First Am. Compl. ¶ 178.

## II.  Analysis

### A.  Entitlement to Payment

Section 626 of the MWMPA provides that "[a]n employee leaving employment must be paid in full within a reasonable time after demand" and creates a private cause of action for "affected employees" to seek "unpaid wages." 26 M.R.S. § 626; *see also* 26 M.R.S. § 626-A (establishing overlapping right of action for "affected employees" to seek "unpaid wages").

Hancock argues that Damisse cannot make out a MWMPA claim because he failed to allege sufficient facts to show that he had any legal entitlement to be paid

for donning and doffing protective clothing in the first place. In response, the Plaintiffs point to § 629 of the MWMPA, which provides that "[a] person, firm or corporation may not require or permit any person as a condition of securing or retaining employment to work without monetary compensation . . . ." 26 M.R.S. § 629(1). In *Cooper v. Springfield Terminal Railway*, 635 A.2d 952 (Me. 1993), Maine's Law Court found that § 629 confers on hourly employees a substantive right to be paid "wages" for all time spent completing activities which constitute "work," even where an otherwise valid employment agreement provides that such time is not compensable. *Cooper,* 635 A.2d at 955 (characterizing § 629 as "minimum standards legislation" to which an employment agreement "must yield" on the issue of whether an employee is entitled to an award of unpaid wages).[6] However, a proviso in § 629 stipulates that its protections do not extend to "work performed in agriculture." 26 M.R.S. § 629(1).

The MWMPA does not define either the term "work" or the phrase "work performed in agriculture," and it does not appear the latter has ever been construed

---

[6]      In *Richardson v. Winthrop School Department*, 983 A.2d 400 (Me. 2009), the Law Court stated that "[a]lthough section 626 creates a statutory right for former employees to *seek* payment, *entitlement* to payment is governed solely by the terms of the employment agreement." *Richardson*, 983 A.2d at 402. There, and in the cases *Richardson* cited for the proposition, the issue was whether § 626 *itself* created a legal entitlement to payment. *Id.* at 402-03 (holding that § 626 creates no independent entitlement to payment for vacation days not compensable under the plaintiff's employment agreement); *Rowell v. Jones & Vining, Inc.* 524 A.2d 1208, 1210-11 (Me. 1987) (same); *Purdy v. Cmty. Telecomms. Corp.*, 663 A.2d 25, 28-29 (Me. 1995) (same); *Burke v. Port Resort Realty Corp.*, 714 A.2d 837, 839 (Me. 1998) (holding that § 626 creates no independent entitlement to payment of commissions before the time specified in the plaintiff's employment agreement). The Court does not read this statement in *Richardson* divorced from its context to overrule *Cooper*, which neither *Richardson* nor the cases it cites in support reference.

13

by a Maine court of record.[7] With respect to the former, the Law Court has prescribed a fact-intensive totality of the circumstances test for determining whether an activity qualifies as "work." *See Cooper*, 635 A.2d at 955 (citing *Crook v. Russell*, 532 A.2d 1351, 1354 n.5 (Me. 1987)). This test can be traced back to the Supreme Court's early FLSA jurisprudence, which established that courts should determine whether an activity qualifies as "work" on a case-by-case basis. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 136-37 (1944). This line of cases defines "work" as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 & n.11 (1944) (citing Webster's Second New Int'l Dictionary definition of "work"). Federal courts applying this test have determined that donning and doffing necessary protective gear is compensable "work." *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 39-40 (2005) (holding that poultry plant workers donning and doffing of required protective clothing constituted a "principal activity," a subset of "work"); *Steiner v. Mitchell*, 350 U.S. 247, 256 (1956) (holding that battery factory workers donning and doffing of old work clothes needed to handle corrosive acids constituted a "principal activity," a subset of "work").

---

[7]     Webster's Third New International Dictionary defines "agriculture" inconclusively, as either "the science or art of cultivating the soil, harvesting crops, and raising livestock" or "the science or art of the production of plants and animals useful to man and *in varying degrees* the preparation of these products for man's use and their disposal (as by marketing)." Webster's Third New Int'l Dictionary 44 (2002) (emphasis added).

Though Hancock is the moving party, it constructs no argument that the donning and doffing described in the complaint falls outside the meaning of "work" as a matter of law. Nor does Hancock develop a theory as to how this the Court should interpret the term "work performed in agriculture" or point to facts in the complaint which establish conclusively that Damisse's work in the freezer qualified.[8] Because Hancock has failed to meaningfully counter Damisse's claim to a legal entitlement to wages under § 629 of the MWMPA for time spent donning and doffing necessary protective clothing, Hancock's primary argument for dismissal fails.

## B. De Minimis Work Doctrine

Hancock also argues that this Court should hold that the MWMPA incorporates the *de minimis* doctrine applied in FLSA cases and that this doctrine requires dismissal of Damisse's claim. Hancock does not identify any cases where Maine courts have held that a corollary *de minimis* doctrine applies to MWMPA claims. Rather, Hancock points out that Maine's Law Court often looks to federal case law and regulations developed under the FLSA for guidance in interpreting ambiguous provisions in Maine's labor laws. *See, e.g., Crook*, 532 A.2d at 1354 (looking to federal law to determine whether firefighters' on-call time constitutes "work" under Maine's overtime laws); *Gordon v. Me. Cent. R.R.*, 657 A.2d 785, 786-87

---

[8]     As the Plaintiffs pointed out at oral argument, Hancock has also admitted that it paid Damisse the time-and-a-half rate provided for by the FLSA during weeks when he worked more than forty hours. First Am. Compl. ¶ 166; Hancock's First Am. Answer to First Am. Compl. ¶ 86 (ECF No. 43). While not conclusive, this at least *suggests* that Damisse's work in the freezer may not qualify as "work performed in agriculture," as the FLSA has its own similar agricultural exemption which Maine courts might look to in order to construe the phrase "work performed in agriculture." *See* 29 U.S.C. § 213(b)(12) (exempting "employees employed in agriculture" from coverage under the FLSA's overtime provisions); 29 U.S.C. § 203(f) (defining "agriculture").

(looking to federal law to determine whether security guard qualifies as an "administrative" worker exempt from Maine's overtime laws); *Dir. of Bureau of Labor Standards v. Cormier*, 527 A.2d 1297, 1299-1300 (Me. 1987) (looking to federal law to determine whether related family businesses operating within a single theme park constitute a single "employer" under Maine's overtime laws). Hancock effectively asks the Court to surmise that the Law Court would extend the application of the *de minimis* doctrine to the MWMPA if it were faced with the issue. *See Perez-Trujillo v. Volvo Car Corp. (Swed.)*, 137 F.3d 50, 55 (1st Cir. 1998).

The FLSA's *de minimis* doctrine was announced in *Anderson v. Mt. Clemons Pottery Co.*, 328 U.S. 680 (1946). The issue there was whether the time employees spent walking from time-clocks at the edge of a large factory to work stations dispersed throughout it should be included as part of the workweek for purposes of calculating overtime. *Id.* As an initial matter, the Supreme Court held that this time *did* constitute "work." *Id.* However, the Supreme Court also noted that the workweek "must be computed in light of the realities of the industrial world" and held that FLSA violations concerning "only a few seconds or minutes of work beyond the scheduled working hours" were *de minimis* and therefore not compensable. *Id.* at 692. Accordingly, it remanded the case to the trial court to make findings regarding the amount of time at issue and to determine whether the *de minimis* doctrine precluded recovery. *Id.* at 694. Courts striving to give practical meaning to *Anderson* often weigh three factors when deciding whether time spent completing otherwise compensable "work" is *de minimis*: "(1) the practical difficulty the employer would

encounter in recording the additional time; (2) the total amount of compensable time; and (3) the regularity of the additional work." *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 373 (4th Cir. 2011); *accord Lindow v. United States*, 738 F.2d 1057, 1062-63 (9th Cir. 1984).

Hancock's *de minimis* argument is likely a non-starter, as applying this FLSA doctrine in the context of a MWMPA claim would seem to run against the plain meaning of the MWMPA. Unlike the FLSA, the MWMPA contains concrete language stressing that employers must pay employees for *all* their labor. Section 621-A of the MWMPA, captioned "Timely and full payment of wages," specifies that "every employer must pay *in full all wages* earned by each employee." 26 M.R.S. § 621-A. (emphasis added). Section 626 of MWMPA specifies that "[a]n employee leaving employment must be paid *in full*" and that that "an employer found in violation of this section is liable for the amount of unpaid wages . . . ." 26 M.R.S. § 626 (emphasis added). Finally, § 629 prohibits employers and employees from entering into any agreement that would permit or require an employee to perform any "work" without compensation. 26 M.R.S. § 629. The meaning of the MWMPA appears to be clear: employers must pay their employees *in full* for their work; if they do not, they will be liable for *all* that they fail to pay. Unlike the cases identified by Hancock where Maine courts looked to the FLSA to give meaning to inherently ambiguous concepts like what constitutes "work" or which employees qualify as "administrative" workers, there is no apparent ambiguity here. *Cf. Gordon*, 657 A.2d at 787; *Crook*, 532 A.2d at 1354; *Cormier*, 527 A.2d at 1299-1300.

However, the Court need not resolve this open question of Maine law, as dismissal of Count 15 is not warranted even if the *de minimis* doctrine does apply to MWMPA claims. Taking the well-plead facts in the complaint as true, the Court can infer that it would have been easy for Hancock to track the time Damisse spent putting on and taking off his protective clothing. Damisse's supervisors would have simply had to allow Damisse to clock in *before* donning and to clock out *after* doffing, rather than the other way around. Under the facts alleged, construed in the Plaintiffs' favor, the only apparent "industrial reality" was a desire to pay Damisse less than he was due. Where *Anderson*'s only stated rationale is completely absent, as it is here, the *de minimis* doctrine can have no force.[9]

## The Over-filled Blueberry Box Claims
## Counts 77, 79, 129, 131, 211, 213, 225, 227, 238 & 240

### I.     Factual Allegations

Coastal employed Clotaire Joseph, Henriquez Polycarpe, Farine Tassy, Fiole Toussaint, and Sola Vilbrun (collectively, the "**Harvester Plaintiffs**") to harvest blueberries during the summer of 2008 and paid each of them "per box" on a piece

---

[9]     This conclusion is supported by regulations promulgated by the Department of Labor, which provide as follows:

> [The *de minimis*] rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47 (internal citations omitted). Here, the Court can infer from the Plaintiffs' allegations that Hancock "arbitrarily" failed to take account of the time it took Damisse to don and doff his protective clothing even though this information was easily "ascertainable." *See id.*

rate basis. First Am. Compl. ¶¶ 669, 1075, 1667, 1767, 1863. The First Amended Complaint alleges that there is a "commonly accepted standard" that defines the level to which a blueberry picker must fill a harvesting box in order to be entitled to the "per box" piece rate, but that Paul instructed the Harvester Plaintiffs to fill their boxes beyond that level. First Am. Compl. ¶¶ 674, 684, 1080, 1091, 1672, 1683, 1772, 1783, 1868, 1879. Coastal supervisors would then pour off the extra blueberries into other boxes. First Am. Compl. ¶¶ 674, 1080, 1672, 1772, 1868.

According to the complaint, Coastal never compensated the Harvester Plaintiffs for raking the extra berries, despite their demands that Coastal do so, nor did Coastal account for this portion of their labor in its field or payroll records. First Am. Compl. ¶¶ 674-75, 688, 1080-81, 1093, 1686, 1672-73, 1772-73, 1787, 1868-69, 1882. The Harvester Plaintiffs each estimate the amount of extra blueberries they raked and seek the equivalent piece rate, trebled, under 26 M.R.S. § 626. First Am. Compl. ¶¶ 689, 1094, 1687, 1788, 1883. The Harvester Plaintiffs also seek statutory damages for violations of AWPA's recordkeeping provision, 29 U.S.C. § 1821. First Am. Compl. ¶¶ 678, 1083, 1675, 1775, 1871.

## II. Analysis

### A. MWMPA Claims

Coastal argues that the Harvester Plaintiffs failed to even minimally describe the standard they claim was "commonly accepted" and failed to allege that the standard was incorporated into their employment agreements with Coastal. Accordingly, Coastal claims, the Harvester Plaintiffs have failed to demonstrate any legal entitlement to "unpaid wages" and their MWMPA claims must fail. The

Plaintiffs counter that any necessary details can be inferred from the facts they did plead.

The Court agrees with the Plaintiffs. From the allegations described above, the Court can infer that the Harvester Plaintiffs' relationship with Coastal was governed by an employment agreement which provided that they would be paid "per box" and that the arguably ambiguous "per box" term should be interpreted in reference to a commonly accepted standard which holds that a blueberry harvesting box is "full" if the blueberries inside it have reached a certain level. The Court can also infer that Coastal breached the Harvester Plaintiffs' employment agreement by paying them less than the specified "per box" rate.

With inferences properly drawn in their favor, the Harvester Plaintiffs have stated sufficient facts to show a plausible entitlement to payment under the terms of an employment agreement. That is enough to state a MWMPA claim for unpaid wages, and therefore enough to survive Coastal's motion to dismiss as to Counts 79, 131, 213, 227, and 240.

### B. AWPA Recordkeeping Claims

Under AWPA's recordkeeping provision, farm labor contractors and agricultural employers who employ migrant agricultural workers must keep individualized records concerning, among other things, the number of piecework units each worker earns. 29 U.S.C. § 1821(d)(1)(B).

In Counts 77, 129, 211, 225, and 238, the Harvester Plaintiffs allege that Coastal failed to keep records that reflected the actual amount of blueberries the Harvester Plaintiffs raked and that Coastal therefore violated 29 U.S.C.

§ 1821(d)(1)(B). Though Coastal moves for dismissal of these counts, it offers no analysis beyond the arguments it makes concerning the MWMPA counts. Coastal's motion therefore fails as to Counts 77, 129, 211, 225, and 238 as well. *See Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 6 (1st Cir. 2005) (explaining that "a litigant has an obligation to spell out its arguments squarely and distinctly") (internal citations and quotation marks omitted).

## CONCLUSION

The Court **DENIES** Defendant Hancock and Defendant Paul's motion to dismiss the claims concerning housing migrant workers in vehicles stated in Counts 17, 39, 59, and 119, **DENIES** Defendant Hancock's motion to dismiss the claim concerning donning and doffing stated in Count 15, and **DENIES** Defendant Coastal's motion to dismiss the claims concerning overfilled blueberry boxes stated in Counts 77, 79, 129, 131, 211, 213, 225, 227, 238 and 240.


SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 15th day of January, 2015.